EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Antonio J. Cabrero Muñiz <br><br> Recurrido <br><br> v. <br><br> Francisco Zayas Seijo; Fulana de Tal y la Sociedad Legal de Gananciales compuesta por Ambos; El Día, Inc., Aseguradora A y B <br><br> El Día, Inc. <br><br> Peticionarios | Certiorari <br><br> 2006 TSPR 77 <br><br> 167 DPR \_\_\_\_ |

Número del Caso: CC-2004-767

Fecha: 5 de mayo de 2006

Tribunal de Apelaciones:

　　　　　　　Regional Judicial de Bayamón

Panel integrado por su Presidente, el Juez Sánchez Martínez, la Jueza Cotto Vives y el Juez Soler Aquino

Abogado de la Parte Peticionaria:

　　　　　　Lcdo. Etienne Totti del Toro (El Día, Inc.)
　　　　　　Lcdo. Etienne Totti del Valle (El Día, Inc.)
　　　　　　Lcdo. Pedro E. Ortiz Álvarez (Francisco Zayas Seijo)

Abogado de la Parte Recurrida:

　　　　　　Lcdo. Luis R. Mena Ramos

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Antonio J. Cabrero Muñiz | | |
| Recurrido | | |
| v. | | |
| Francisco Zayas Seijo; Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos; El Día, Inc., Aseguradoras A y B | CC-2004-767 | |
| El Día, Inc. | | |
| Peticionarios | | |

SENTENCIA

San Juan, Puerto Rico, a 5 de mayo de 2006

El 14 de octubre de 1998, el Sr. Antonio Cabrero Muñiz presentó una demanda en daños y perjuicios contra, entre otros, el Hon. Francisco Zayas Seijo, entonces miembro de la Cámara de Representantes del Estado Libre Asociado de Puerto Rico y el periódico, El Nuevo Día, Inc. Al momento de instarse la demanda, el señor Cabrero Muñiz fungía como Síndico Especial de la Oficina para la Liquidación de Cuentas de la Corporación de Renovación Urbana y Vivienda ("la Oficina de Liquidación").

Se alegó en la demanda, respecto el entonces representante Zayas Seijo, que éste había difamado al señor Cabrero al hacer unas expresiones públicas, tanto verbales como escritas, relacionadas con varias transacciones efectuadas por la Oficina de Liquidación.

CC-2004-767

En cuanto al rotativo *El Nuevo Día*, el señor Cabrero Muñiz alegó que el periódico publicó unos reportajes relacionados con su gestión frente a la Oficina de Liquidación que fueron difamatorias contra su persona. Se indicó expresamente lo siguiente, que los reportajes eran "fal[s]os y se realizaron intencionalmente, con malicia real, con conocimiento de su falsedad y grave menosprecio a la verdad con el único propósito de privarle de la confianza pública y trato social y/o perjudicarle en su trabajo y/o a desacreditarle y deshonrarle públicamente."

Instada la demanda, *El Nuevo Día* contestó la misma negando las alegaciones y levantó varias defensas afirmativas.

Luego de varios trámites procesales, el 3 de septiembre de 2003, El Nuevo Día presentó ante el Tribunal de Primera Instancia una moción solicitando sentencia sumaria parcial. La moción se fundamentó en que a juicio del periódico, no había controversia alguna sobre el hecho material de ausencia de falsedad y malicia real en las noticias publicadas por el periódico que alegadamente difamaron al demandante. Indicó el periódico también que las publicaciones objetadas por Cabrero Muñiz constituyen un reportaje justo y verdadero y como tal, gozan del correspondiente privilegio. El demandante a su vez, se opuso a dicha petición.

El 28 de mayo de 2004, el foro primario emitió una Resolución en la cual determinó, entre otras cosas, que el

demandante era figura pública para efectos de su reclamación y denegó la solicitud de sentencia sumaria parcial presentada por *El Nuevo Día*.

Inconforme, *El Nuevo Día* presentó un recurso de *certiorari* ante el Tribunal de Apelaciones. El foro apelativo intermedio, por voto mayoritario, denegó la expedición del recurso presentado por el rotativo. Concluyó el tribunal que el demandante había aportado evidencia cuya posible credibilidad justificaría una conclusión de que el periódico demandado hizo expresiones difamatorias, falsas y con malicia real. En vista de lo cual era improcedente resolver el caso sumariamente y se confirmó al foro primario.

Inconforme nuevamente, *El Nuevo Día* acudió ante este Tribunal en solicitud de *certiorari* el 16 de agosto de 2004. En su recurso señaló la comisión de los siguientes errores:

> Erraron el Tribunal de Apelaciones y el Tribunal de Instancia en su examen del estándar a aplicar bajo la Regla 36 de las de Procedimiento Civil, al aplicar en su consideración de la petición y la moción de sentencia sumaria parcial de END los criterios convencionales que requieren al tribunal considerar lo planteado a la luz más favorable al demandante cuando la jurisprudencia claramente requiere imponerle al demandante en casos que envuelvan la libertad de prensa, la carga de establecer con prueba clara y convincente en la etapa de sentencia sumaria, tanto la falsedad de lo publicado como el hecho de que se publicó con conocimiento de que era falso o con grave menosprecio de si era o no era falso.

> Erraron el Tribunal de Apelaciones y el Tribunal de Primera Instancia al enlazar las defensas de END con las del co-demandado

legislador Zayas Seijo, sin considerar ni discutir la clara diferencia que existe entre las posiciones y defensas que asisten a estas partes en torno las alegaciones hechas por el demandante recurrido (como el privilegio del reportaje justo y verdadero.)

Expedimos el auto solicitado y ambas partes han comparecido.

Evaluado los escritos presentados por las partes así como el extenso expediente del caso se dicta Sentencia y se revoca la determinación del Tribunal de Apelaciones. Se declara con lugar la moción de sentencia sumaria presentada por *El Nuevo Día* y se desestima la demanda instada en su contra.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión de Conformidad a la cual se une el Juez Presidente señor Hernández Denton. El Juez Asociado señor Rebollo López disiente sin opinión escrita. El Juez Asociado señor Rivera Pérez emitió una Opinión Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Antonio J. Cabrero Muñiz<br><br>    Recurrido<br><br>        v.<br><br>Francisco Zayas Seijo; Fulana de Tal y la Sociedad Legal de Gananciales compuesta por ambos; El Día, Inc., Aseguradoras A y B<br><br>El Día, Inc.<br><br>    Peticionarios | CC-2004-767 |

Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se le une el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 5 de mayo de 2006

La libertad de expresión sobre asuntos de interés público es cimiento de la democracia —tan importante, quizás, como el sufragio. Sin embargo, la *Resolución* recurrida impone sobre el periódico demandado los gastos e inconvenientes de continuar un litigio, sin cumplirse los requisitos constitucionales cuya función es evitar que el espectro de la responsabilidad civil sofoque la expresión sobre temas de interés público. Es por ello que nos vemos precisados a emitir esta Opinión de Conformidad.

I.

La pregunta en el caso de marras es si erró el Tribunal de Apelaciones al no expedir un auto de *certiorari* para revocar una *Resolución* del Tribunal de Primera Instancia, *Resolución* que denegó la desestimación sumaria

de una demanda de libelo contra el periódico, *El Nuevo Día*. Estimó el foro *a quo* que el ex-funcionario público, Antonio Cabrero Muñiz,[1] ha cumplido con los requisitos constitucionales de su acción, al menos en esta etapa procesal.

Específicamente, el Tribunal de Apelaciones concluyó que el demandante ha aportado evidencia cuya posible credibilidad justificaría una determinación de que el periódico demandado hizo expresiones difamatorias, falsas y con malicia real. Dicha conclusión responde al siguiente razonamiento. Primero, la prueba documental revela manifestaciones del periódico cuyo contenido es potencialmente falso y difamatorio, manifestaciones hechas, posiblemente, sin corroboración. Segundo, tal falta investigativa implica que es necesario evaluar la intención del demandado para determinar si hubo malicia real. Tercero, el mecanismo de sentencia sumaria debe evitarse cuando la adjudicación depende en gran medida de la evidencia testifical y su credibilidad. Por ende, era improcedente la desestimación sumaria en el caso de autos. Apéndice, págs. 401-415.

## II.

Cabe apuntar, en primer lugar, dos consideraciones que enmarcan nuestra conformidad con la sentencia dictada en el día de hoy. Primero, éste es un caso de sobre expresiones

---

[1] El demandante, Antonio Cabrero Muñiz, se desempeñaba, al momento de los hechos, como Síndico Especial de la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda.

relacionadas con la gestión de un **funcionario público.**

A pesar de que existe una diversidad de concepciones jurídicas y filosóficas sobre la naturaleza y alcance de la libertad de expresión, pocos dudan que tal manifestación política sea acreedora de la mayor protección disponible, y del rol preeminente de la prensa en la diseminación de tales asuntos de alto interés público. Con gran elocuencia, el Juez Asociado Black destacó en *Mills v. State of Alabama*, 384 U.S. 214, 218-219 (1966), citamos *in extenso*:

> **Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.** This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, **but also humble leaflets and circulars, to play an important role in the discussion of public affairs.** Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people they were selected to serve. **Suppression of the right of the press to praise or criticize government agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.**
> (Énfasis nuestro.)(Cita omitida.)

También véase, *e.g.*, E. Chemerinsky, *Constitutional Law: Principles and Policies*, 2da ed., Aspen, N.Y, 2002, págs. 896-897 ("there is little disagreement that political speech is at the core of that protected by the First

Amendment."); R. Smolla, *Law of Defamation*, Thomsom-West, St. Paul, 2005, § 1:31; Mielkejohn, *The First Amendment is an Absolute*, 1961 *Sup. Ct. Rev.* 245, 256-257.

Por otro lado, no debemos permitir que las circunstancias del peticionario determinen el análisis normativo. La Opinión Disidente reitera las expresiones de *Pérez Rosado v. El Vocero*, supra, sobre el "poder inconmensurable" de la prensa y su "gran responsabilidad". Pág. 14. Sin duda son correctas estas aseveraciones, pero su veracidad es producto de su generalidad. Debemos recordar que existen periódicos y medios carentes de un "poder inconmensurable". La gran mayoría de ciudadanos carece también tal poder. Por ende, es nuestro deber evaluar la controversia de autos en abstracción de las características del demandado --e.g., que es un periódico reconocido y económicamente sólido, pues la protección que garantiza la Constitución a la prensa no se configura en función del estado financiero del medio.

## III.

Partiendo de las consideraciones antes expresadas, entendemos que la *Resolución* recurrida y la Opinión Disidente caracterizan desacertadamente la naturaleza y contenido de la normativa constitucional aplicable. Comenzamos en esta sección con varios apuntes metodológicos.

## A.

Las acciones por difamación suscitan un conflicto

entre la libertad de expresión y varios intereses relacionados con el derecho a la intimidad. Artículo II, §§ 4 y 8 de la Constitución del Estado Libre Asociado, 1 L.P.R.A.; *Pérez Rosado v. El Vocero*, 149 D.P.R. 427, 441-442 (1999); *Ojeda v. El Vocero*, 137 D.P.R. 315, 327-328 (1994); *Soc. de Gananciales v. El Vocero*, 135 D.P.R. 122, 126-128 (1994); *Méndez Arocho v. El Vocero*, 130 D.P.R. 867, 876-877 (1992); *Villanueva v. Hernández Class*, 128 D.P.R. 618, 640-641 (1991); *Maldonado v. Marrero Padilla*, 121 D.P.R. 705, 713 (1988); *González Martínez v. López*, 118 D.P.R. 190, 192 (1987); *Clavell v. El Vocero*, 115 D.P.R. 685, 690-691 (1984); *Torres Silva v. El Mundo*, 106 D.P.R. 415, 421, 427 (1977). Por supuesto, existe una concepción absolutista de la libertad de expresión. Sus proponentes sostienen que, de surgir un verdadero conflicto entre el derecho de expresión y cualquier otro derecho o interés, debe prevalecer el primero. Véase, por ejemplo, I *Smolla and Nimmer on Freedom of Speech,* West Publishing, St. Paul, 2005, §§ 2:10 y 2:47-2:54, págs. 2-6 y 2-45 – 2-56. Éste Tribunal ha rechazado, correctamente, tal doctrina.

Ahora bien, la reconciliación o balance de derechos o intereses en materia de libre expresión puede lograrse mediante dos principales metodologías. La primera es un enfoque casuístico que procura hacer el balance más apropiado según las circunstancias de cada caso. Aquí los conceptos jurídicos, cuyo contenido varía según los hechos

del caso, sirven para encausar o guiar la discreción judicial. La segunda metodología procura limitar la flexibilidad de los conceptos y el ejercicio de discreción judicial. Bajo este enfoque categórico, por ejemplo, una vez se determina que el demandante por difamación es un funcionario público, aplica el mismo requisito de 'malicia real' independientemente de si se trata del Gobernador o de un alcalde, si el demandado es un particular o un gran periódico, si la publicación fue respetuosa o en extremo ofensiva, etc.[2]

La doctrina moderna indica que el método de análisis predominante ha sido el desarrollo de categorías y reglas. Así, un reconocido tratado estadounidense distingue las metodologías de "absolutism", "*ad hoc* balancing" y "heightened scrutiny". La segunda metodología es muy parecida a lo que hemos denominado el análisis casuístico. La tercera se nutre principalmente del método categórico y constituye lo que se ha considerado, "the methodology that dominates contemporary First Amendment jurisprudence." I *Smolla and Nimmer on Freedom of Speech*, *op. cit.*, §§ 2.9-2.12, págs. 2.6-2.10.[3]

---

[2] Somos conscientes de que la distinción postulada, entre el desarrollo de reglas y la adjudicación caso a caso, en ocasiones revela sutilezas. Evidentemente, las reglas jurisprudenciales tienen que elaborarse caso a caso. Existen conceptos, incluso, para los cuales es difícil desarrollar una definición adecuada que disponga de todos los casos.

[3] Véase, además: L. H. Tribe, *American Constitutional Law*, § 12-2, 2da ed., Mineola, Foundation Press, 1988, págs. 791-794; R. D. Rotunda y J. E. Nowak, *Treatise on*

El método categórico impera en el recinto de la difamación.  Así lo afirma, por ejemplo, el Tribunal Supremo de los Estados Unidos en varias de sus opiniones medulares.  Véase, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-344 (1974) y su progenie.  Ciertamente, dicho foro ha opinado que el desarrollo de algunos conceptos, tales como el de grave menosprecio a la verdad, sólo puede lograrse caso a caso.  Pero su meta ha sido elucidar el contenido de los conceptos jurídicos, pues dicha búsqueda es particularmente importante en el ámbito de la libertad de expresión, habida cuenta que,  "[u]ncertainty as to the scope of the constitutional protection can only dissuade protected speech --the more elusive the standard, the less protection it affords."  *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 686 (1989).

Un análisis pausado de nuestra jurisprudencia moderna sobre difamación también revela que la tendencia predominante ha sido procurar la elaboración de reglas en vez de la adjudicación *ad hoc*.  Establecimos este enfoque claramente en *Torres Silva v. El Mundo*, supra, a la pág. 421, al examinar y acoger lo dispuesto por el Tribunal Supremo de los Estados Unidos en *Gertz v. Robert Welch, Inc.*, supra, indicando lo siguiente:

> Reconociendo. . .la tensión que inevitablemente produce la afirmación de un  interés social sobre

---

*Constitutional Law: Substance and Procedure* § 20.7, 2da ed., West Publishing, St. Paul, 1992, pág. 23 ("Harlan never advocated an *ad hoc* balancing.  The result of his balancing was a rule of law with precedential effect").

> otro, en *Gertz v. Robert Welch, Inc.*, supra, el Tribunal Supremo de los Estados Unidos elaboró una fórmula de conciliación de ambos intereses, el de la libertad de prensa y el de la reputación de la persona. Se ubica el ámbito de uno y otro interés en la naturaleza del 'status' de la persona injuriada.

La mayoría de nuestras Opiniones posteriores que aluden al balance de intereses son compatibles con este enfoque.[4] *Ojeda Ojeda v. El Vocero*, supra, a la pág. 327; *Sociedad de Gananciales v. El Vocero*, supra, a la pág. 136; *Méndez Arocho v. El Vocero*, supra, a las págs. 876-877; *Maldonado v. Marrero Padilla*, supra, a la pág. 713. Así mismo, la mayoría de nuestras expresiones sobre la necesidad de hacer un balance de intereses, caso a caso, son de limitada aplicabilidad, pues nuestras decisiones se dan en el contexto de figuras privadas y no públicas como en el caso de autos.[5]

Además de la amplia autoridad jurídica que lo apoya, el método categórico resulta ser el más apropiado, especialmente tratándose de expresiones sobre la gestión de un funcionario público. El estrecho vínculo entre la democracia y la deliberación no exige menos. Debemos recordar que uno de los propósitos principales de la

---

[4] A modo de excepción, véase *Garib Bazain v. Clavell*, 135 D.P.R. 475, 486 n. 4 (1994) (ante el conflicto de los derechos constitucionales, "hay que hacer un balance de intereses al resolver cada caso en particular.")

[5] Véase: *Pérez Rosado v. El Vocero*, supra; *González Martínez v. López*, supra, a la pág. 192. También hemos indicado, en el contexto de circunstancias muy especiales, que la definición de los conceptos "figura pública" o "funcionario público" sólo puede precisarse mediante el estudio de los hechos particulares del caso. *Clavell v. El Vocero*, supra, a la pág. 695.

normativa en este campo es evitar el efecto disuasivo que el derecho podría tener sobre la libre expresión en asuntos de interés público. Véase, e.g., *Pérez Rosado v. El Vocero*, supra, a la pág. 445. Ello exige, entre otras cosas, que los ciudadanos tengan un grado razonable de certeza con respecto al significado de los conceptos jurídicos pertinentes, así como sus consecuencias procesales. Poco abona a dicha certeza la infinita flexibilización casuística de los conceptos, la transmutación de la persona realmente maliciosa en una especie de persona prudente y razonable.

## B.

Antes bien, las consideraciones expuestas nos llevan a expresar nuestra preocupación con ciertas expresiones de la Opinión Disidente, cuyo texto podría interpretarse como un endoso del balance de intereses *ad hoc* en este tipo de controversia.[6] Esta preocupación recibe su más cabal demostración cuando la Opinión reitera nuestras expresiones sobre los deberes de la prensa en *Pérez Rosado* v. *El Vocero*, supra, **un caso cuyo demandante era figura privada en vez de funcionario público.** Se dice que, "[c]on relación a aquellas noticias con alto potencial de ser

---

[6] La referida Opinión señala que "estos casos requieren **del juzgador** un delicado balance de intereses." Pág. 4 (énfasis nuestro); citando a *Pérez Rosado* v. *El Vocero*, supra. Luego añade que el concepto 'grave menosprecio a la verdad' no se puede encerrar en una "definición inflexible", pues "la determinación de lo que constituye malicia real dependerá de los hechos particulares de cada caso." Págs. 10-11.

difamatorias, los medios deben ejercer **un grado mayor de diligencia** y sopesar los intereses en conflicto."[7].   Es decir, a mayor grado de potencial difamatorio, mayor será el deber de cuidado, y menor será el grado de malicia real que debe probar un demandante.

Las sofocantes consecuencias serían predecibles. Acudiría a los tribunales una tropa de funcionarios y figuras públicas alegando que lo que les falta en cuanto a malicia real les sobre en cuanto a potencial difamatorio. Eventualmente, llegarían casos donde las expresiones habrían sido tan dañinas, y tan evidentemente difamatorias, que, en su afán de hacer justicia, los tribunales sucumbirían a la tentación de atenuar excesivamente el requisito de malicia real, convirtiéndolo en un requisito de mera negligencia.[8]

---

[7] La cita completa es:  "Con relación a aquellas noticias con alto potencial de ser difamatorias, los medios deben ejercer **un grado mayor de diligencia** y sopesar los intereses en conflicto.  Una conducta errática que responda al descuido o la negligencia, así como un acto u omisión deliberado o intencional, puede destruir reputaciones, la paz y tranquilidad personal y familiar, y hasta poner la seguridad y la vida de personas en grave peligro.  La razonabilidad en el proceso de publicación y cotejo de la veracidad de noticias con impacto difamatorio se determinará conforme a las circunstancias particulares de cada caso tomando en consideración la norma antes expresada."  Págs, 12-13 (énfasis original); citando a *Pérez Rosado* v. *El Vocero,* supra*.*

[8] Es menester apuntar que la jurisprudencia estadounidense nos ofrece un ejemplo del riesgo a que aludimos.  Se trata del caso *Dennis v. U.S.*, 341 U.S. 494 (1951).  Allí, una pluralidad del Tribunal Supremo modificó la antigua doctrina de "clear and present danger" al resolver que, para determinar si era punible una expresión subversiva, se debía tomar en cuenta la gravedad del peligro.  Es decir, a mayor el potencial dañino de la expresión, menor la

**IV.**

Nuestro ordenamiento establece que un funcionario o figura pública prevalecerá en su acción por difamación sólo cuando alegue y pruebe que el demandado le causó daños al hacer expresiones difamatorias, falsas y con malicia real. *Pérez Rosado* v. *El Vocero*, supra, a la pág. 442; *Garib Bazain* v. *Clavell*, supra, a la pág. 482; *Ojeda Ojeda* v. *El Vocero*, supra, a las págs. 328-329; *Soc. de Gananciales* v. *El Vocero*, supra, a las págs. 135-136; *Méndez Arocho* v. *El Vocero*, supra, a las págs, 877-878; *Villanueva* v. *Hernández Class*, supra, a las págs, 643-643; *Maldonado* v. *Marrero Padilla*, supra, a la pág. 715; *Ocasio Carrasquillo* v. *Alcalde de Maunabo,* 121 D.P.R. 37, 61-62 (1988); *González Martínez* v. *López*, supra, a las págs. 192-193; *Soc. de Gananciales* v. *López*, 116 D.P.R. 112, 115 (1985); *Oliveras* v. *Paniagua Diez*, 115 D.P.R. 257 (1984); *García Cruz* v. *El Mundo*, 108 D.P.R. 174 (1978); *Torres Silva* v. *El Mundo,* supra, a la pág. 427.  El recurso de epígrafe exige un análisis de los últimos dos requisitos.

**A.**

Sólo las expresiones falsas dan lugar a una acción por difamación.  Corolario conceptual de esta norma es la

---

exigencia de un peligro claro y presente.  Esta norma, aparentemente sabia, postulada originalmente por el legendario Learned Hand, desapareció rápidamente y ha sido objeto de severas críticas.  Ello responde a un hecho casi matemático:  habida cuenta de lo terrible que sería la destrucción de nuestro sistema democrático, al "subversivo" siempre le sobra en potencial dañino lo que le falta en probabilidad de éxito, y termina, pues, sin protección alguna.  Véase, *e.g.*, Chemerinsky, *op. cit.*, págs. 961-964.

distinción entre hechos y opiniones, la cual establece

e ilustra el caso de *Garib Bazain* v. Clavell, supra.  Allí,

el naturópata demandado criticó la gestión de un médico

dedicado a los pacientes del S.I.D.A.   Expresó, por

ejemplo, que "la más elemental honestidad debería impedirle

cobrar estas sumas [$250.00, $500.00] por desahuciar a los

pacientes y enviarlos al notario y la funeraria".[9]  *Garbi*

*Bazain*, supra, a la pág. 493.   Explicamos que el único

hecho potencialmente difamatorio en esta expresión era el

de las cantidades cobradas.   Lo demás era opinión e

hipérbole retórica.

Obsérvese, en particular, que *Garib Bazain* no

caracteriza la referida imputación de deshonestidad como un

hecho difamatorio, al considerarla una aseveración cuya

---

[9] Las demás expresiones analizadas del demandado fueron las siguientes.   (1) "especialista en no saber curar el A.I.D.S.  y enviar a sus pobres pacientes ¡a la funeraria!" (2) "La Medicina es un negocio y un fraude".   (3) "Por lo que sabemos (¡y sabemos muchas cosas!) el Dr. Jorge Garib está contra nosotros 100% y lo ha manifestado en mil y una ocasiones porque lo pusimos en ridículo al comentar su famoso libro por lo absurdo y por lo estúpido como obra de un médico".   (4) "a este famoso doctor Jorge Garib se le busca para curar el S.I.D.A., no para hacer diagnósticos inseguros ni dar tratamientos inefectivos.  No acepta retos para curar, sólo recomienda testamentos y funerarias, ni siquiera un cura.  Los gays lo buscan para curarse no para sus pompas fúnebres, ni para que se equivoque.  Y los médicos no quieren enviarle enfermos para que les cobre y los entierre.  ¡Sálvese quien pueda!  La medicina es para curar no para despedir el duelo ni hacer llorar a las plañideras.  ¿Sí o sí?".   (5)  "embaucó a un público desesperado por curarse de esta llamada terrible enfermedad".   (6) "ha convertido su oficina en un comercio descarado."   (7) "¡esto es el colmo!  Ni Girod ni Peñagar[í]cano fueron tan listos ni actuaron con tanta seguridad".   (8) "Los médicos están que trinan ante este caso de megalomanía".  *Garib Bazain*, supra, a las págs. 491-492.

certeza "no es susceptible de determinarse con evidencia objetiva". *Garib Bazain*, supra, a la pág. 494. A primera vista, este fundamento resulta curioso. ¿No podía presentarse evidencia objetiva sobre los gastos del consultorio médico, las tarifas de otros especialistas, la reputación profesional del galeno, etc.? La respuesta es que era distinta la deshonestidad imputada: a saber cobrar $250 o $500 por servicios médicos que no evitarían las consecuencias terminales del S.I.D.A. La honestidad del galeno, probada al palio de los criterios profesionales y comerciales vigentes, no hubiera refutado cabalmente tal manifestación.

Vemos así como *Garib Bazain* v. *Clavell* constituye un espacio amplio y vital para la expresión de ideas. Sólo las aseveraciones que admiten una certera refutación mediante evidencia objetiva dan lugar a la acción por difamación.[10]

**B.**

La acción por difamación contra un funcionario o figura pública exige prueba clara y convincente de que el demandado actuó con malicia real. Veamos algunas características de este requisito.

**1.**

---

[10] Vale la pena añadir que expresamos lo siguiente en *Méndez Arocho* v. *El Vocero*, supra, a la pág. 882 (1992): "la prensa, en el desempeño de sus funciones, no puede estar sujeta a limitaciones que le impidan hacer conclusiones o inferencias razonables de los hechos que día a día informan."

A pesar de su nombre, el concepto 'malicia real' no se refiere a la intención del locutor, sino al conocimiento que tuvo.  Quien se expresa con malicia real lo hace a sabiendas de que los hechos imputados son falsos o con grave menosprecio a la verdad, incurriendo en el susodicho menosprecio quien se expresa albergando serias dudas con respecto a la veracidad de los hechos imputados. *Garib Bazain* v. *Clavell*, supra, a las págs. 484-485; *Ojeda Ojeda* v. *El Vocero*, supra, a la pág. 329; *Soc. de Gananciales* v. *El Vocero,* supra, a la pág. 136; *Méndez Arocho* v. El Vocero, supra, a las págs. 877-878; *Villanueva* v*. Hernández Class*, supra, a las págs. 642-643; *Soc. de Gananciales* v. *López*, supra, a la pág. 115; *García Cruz* v. *El Mundo*, supra, a las págs. 180-181; *Torres Silva* v. *El Mundo*, supra, a las págs. 421 y 427.  Por ende, la prueba de mala voluntad u odio no basta para configurar este requisito.  *Garib Bazain* v. *Clavell*, id.; *García Cruz* v.*El Mundo*, id.

Conviene enfatizar que la malicia real es una figura subjetiva.  Es decir, la prueba debe establecer que el demandado **supo** la falsedad de lo expresado o **tuvo** serias dudas al respecto. **No basta con probar que el demandado debió tener tal estado subjetivo**, **o que una persona normal lo hubiera tenido**.  *Garib Bazain* v. *Clavell*, supra, a la página 484; *García Cruz* v. *El Mundo*, a las págs. 180-181.

La prueba de malicia real debe ser clara y convincente.  Ello significa, entre otras cosas, que ésta debe surgir de hechos específicos.  No basta con afirmar o

presumir el estado subjetivo del demandado. Además, la determinación de si existe prueba suficiente es una cuestión de estricto derecho. *Garib Bazain* v. *Clavell*, supra, a las págs. 484-485, 499. Véase, también: *Villanueva* v. *Hernández Class*, supra a las págs 643 y 644-645; *Soc. de Gananciales* v. *López*, supra, a la pág. 115; *Clavell* v. *El Vocero*, supra a la pág. 696; *Oliveras* v. *Paniagua Diez*, supra, a la pág. 270; *García Cruz* v. *El Mundo*, supra, a las págs. 10-181 y 183.

En determinadas circunstancias, el juzgador puede inferir la malicia real de los hechos probados. *García Cruz* v. *El Mundo*, v. supra, a la pág. 181. Una de las preguntas que suscita el recurso de epígrafe es si la falta de investigación, o su deficiencia, podría justificar tal inferencia. Veamos.

## 2.

La falta de investigación no constituye ni basta como prueba de maliciar real. Es decir, la ausencia de evidencia tendiente a demostrar el estado subjetivo del demandado hace irrelevante cualquier falta investigativa. *St Amant* v. *Thompson*, 390 U.S. 727, 732-733 (1968); véase, también, *New York Times* v. *Sullivan*, supra, a las págs. 287-288.

Aún cuando existe alguna prueba independiente de malicia real, sólo ante circunstancias excepcionales se debe considerar la gestión investigativa. En *García Cruz* v. *El Mundo*, señalamos que el grave menosprecio a la verdad "no se mide por lo que un hombre razonable prudente hubiese

publicado o hubiese investigado antes de la publicación." *García Cruz*, supra, a la pág. 181. Incluso, hemos reiterado que las expresiones erróneas son acreedoras de protección constitucional.[11]

Como nuestra jurisprudencia no ha examinado detenidamente el tipo de corroboración deficiente que permitiría la inferencia de malicia real al palio de nuestra Constitución,[12] acudimos a la casuística del Tribunal Supremo "estadounidense para identificar los

---

[11] "Hemos rechazado anteriormente que la libertad de prensa, protegida a su vez mediante el requisito de **malicia real**, solamente cobije la publicación de informaciones correctas. [L]as manifestaciones erróneas son inevitables en la discusión de los asuntos públicos. El propósito de la garantía constitucional es mantener un clima abierto para la discusión franca y vigorosa de los asuntos de interés público y de la conducta y ejecutoria de los funcionarios públicos. ... Por eso, la libertad de prensa incluye tanto la manifestación veraz como la incorrecta . . ." *Garib Bazain* v. *Clavell*, supra, a la pág. 485 (citas y comillas omitidas).

[12] Son relevantes los casos de *Ocasio Carrasquillo* v. *Alcalde de Maunabo*, supra, a la pág. 64, *González Martínez* v. *López*, supra, a las págs. 96-97 y *Zequeira Blanco* v. *El Mundo*, 106 D.P.R. 432 (1977). Los primeros dos casos se resolvieron con miras al requisito de negligencia. *Zequeira Blanco* no produjo una Opinión certificada de este Tribunal, aunque lo hemos citado posteriormente. Allí el periódico demandado criticó la rebaja de una fianza impuesta a Filiberto Ojeda. Atribuyó la determinación, equivocadamente, al Juez de Distrito Zequeira Blanco. Instada una demanda por difamación, el periódico solicitó la desestimación sumaria con miras al requisito de malicia real. Acompañó una declaración jurada, suscrita por un Editor de Noticias, quien aseguró haber obtenido la información del vocero oficial de la Policía, a quien acostumbraba consultar y quien había sido una fuente confiable por muchos años. Al resolver que procedía la desestimación sumaria, destacamos la ausencia de alegaciones sobre hechos que demostrarían la malicia real del periódico.

mínimos parámetros constitucionales.[13]

En *St. Amant* v. *Thompson*, supra, el demandado imputó cierta conducta delictiva a un oficial del orden público ("deputy sheriff") en el curso de una campaña electoral. Según el máximo foro estatal, Thompson actuó sin ponderar las consecuencias para el demandante, sin conocimiento personal de los hechos, y sin realizar investigación alguna confiando exclusivamente en las declaraciones juradas de una persona cuya reputación por honestidad no surgía del récord.[14] El Tribunal Supremo resolvió que tales hechos no establecen la malicia real:

> Nothing referred to by the Louisiana courts indicates an awareness by St. Amant of the probable falsity of Albin's statement about Thompson. Failure to investigate does not in itself establish bad faith. . . [T]he most the state court could say was that there was no evidence in the record of Albin's reputation for veracity, and this fact merely underlines the failure of Thompson's evidence to demonstrate a low community assessment of Albin's trustworthiness or unsatisfactory experience with him by St. Amant.

---

[13] La Opinión Disidente discute la jurisprudencia de otros tribunales estadounidenses. Con el máximo respeto observamos que dicha casuística se invoca sin el beneficio de una confrontación con los hechos pertinentes, circunstancia que cobra mayor relieve al sostenerse que el concepto 'malicia real' sólo puede precisarse al palio de los hechos particulares de cada caso. Ahora bien, cabe señalar que la jurisprudencia citada no contradice claramente nuestra aseveración de que sólo en circunstancias excepcionales puede invocarse una falta investigativa para establecer determinantemente la malicia real. Por ejemplo, el caso de *Vandenburg* v. *Newsweek*, 507 F.2d 1024, 1026 (5to Circ. 1975), se refiere a una investigación que sea **"grossly inadequate** in the circunstances." (Énfasis suplido.)

[14] Después de concluir que estos hechos no establecen la malicia real, el Tribunal añade que Thompson tenía motivos razonables para confiar en su fuente. *St. Amant* v. *Thompson*, supra, a la pág. 733 (1968).

*St. Amant*, supra, a las págs. 732-733.[15]

En cambio, el caso de *Harte-Hanks Communicatios* v. Connaughton, supra, ilustra las circunstancias que dan lugar a la inferencia de malicia real, según el máximo foro federal.  Daniel Connaughton, un candidato a un puesto judicial electivo, demandó a un periódico que había respaldado a su contrincante por unas imputaciones hechas respecto una campaña de descrédito alegadamente orquestada por él en contra de su rival.  Específicamente se objetó, entre otras cosas, la publicación de lo siguiente:  que él realizó una entrevista gravada con una tal Patsy Stephens y con su hermana Alice Thompson, sobre la conducta delictiva de un empleado de su contrincante; que él detuvo la cinta en múltiples ocasiones; que, detenida la cinta, ofreció recompensas por sus declaraciones a las dos hermanas y reveló la intención de chantajear a su rival en la contienda electoral.  El periódico citó a Thompson --quien no era la fuente principal y si su hermana-- como su fuente, a quien entrevistó en dos ocasiones, e informó justamente la posición de Connaughton.  No obstante, surgía

---

[15] El Tribunal caracterizó restrictivamente el tipo de evidencia que hubiera bastado, al advertir:  "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.  Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.  Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."  *St. Amant*, supra, a la pág. 732.

del récord que las expresiones de Thompson al periódico fueron inconsistentes y vacilantes, que los otros seis testigos --vinculados con Connaughton-- negaron rotundamente las imputaciones contra éste, que el periódico nunca entrevistó a la principal declarante, Stephens, y que tampoco escuchó la grabación para verificar, por ejemplo, si Connaughton había detenido la cinta. El Tribunal resolvió que tales hechos permitían la inferencia de malicia real. Aún así caracterizó restrictivamente el estándar aplicable:

> Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence. . . and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry. Thus, we are satisfied that the Court of Appeals judged the case by the correct substantive standard.

*Harte-Hanks Communications*, supra, a la pág. 668.

De modo que la mala investigación permite una inferencia de malicia real sólo en circunstancias excepcionales[16] y con el beneficio de otra evidencia tendiente a demostrar tal malicia.

## C.

Habida cuenta de las normas expuestas, es preciso destacar nuestra respetuosa preocupación con ciertas expresiones de la Opinión Disidente. Ésta comienza su exposición del derecho señalando que la libertad de prensa

---

[16] La controversia de autos no requiere una caracterización precisa de cuáles son esas circunstancias al palio de nuestra Constitución.

no cobija a quien "deliberadamente [ofrece] sólo la versión de una parte de lo acontecido, que es motivo de debate político, cuando ello produce una falta de información sobre la totalidad de las versiones vertidas sobre el asunto por todas las partes envueltas." Este deber de informar "cobra mayor importancia" cuando se cuestiona, "en el debate político, la gestión de un funcionario público . . ." Todo esto responde a que el propósito de la libertad de prensa es informar al pueblo, quien tiene derecho a conocer "todos los ángulos del debate político", sin que se comprometa "la verdad de lo acontecido." Opinión, págs. 2-3.

Un análisis de las expresiones citadas sugiere que se proponen establecer los siguientes principios y normas: (1) son muy distintas la libertad de expresión y la libertad de prensa; (2) el único propósito de la última es informar al pueblo; (3) por ende, la libertad de prensa no protege a quien incumple deliberadamente el deber de informar la posición de todos los participes en un debate político; y (4) este deber de informar aplica con mayor rigor cuando se cuestiona la gestión de un funcionario público.

Basta con enumerar estas premisas para apreciar que se apartan sustancialmente de la normativa constitucional vigente. Somos consientes, por supuesto, que el derecho comparado ofrece una variedad de sistemas democráticos, los cuales ostentan normas distintas sobre la libertad de

expresión.[17]   Igual consciencia tenemos de las apreciaciones

críticas  que  algunos  comentaristas  han  formulado  con

respecto a la normativa de *New York Times v. Sullivan* y su

progenie.[18]    Nada  impide  que  este  Tribunal  evalúe  tales

circunstancias  al  desarrollar  una  interpretación  crítica,

cosmopolita y progresista de nuestra Constitución.   Empero,

dicha  tarea  debe  ejecutarse  sin  obviar  los  principios

fundamentales  de  nuestro  ordenamiento  ni  las

características  sociológicas  y  jurídicas  que  nos  distinguen

de otros países.[19]  Por ello nos preguntamos --y la pregunta

no es retórica-- ¿cómo habrá de armonizarse el amplio deber

---

[17] Véase, por ejemplo:  R.J. Krotoszynski, *Defamation in the Digital Age:  Some Comparative Law Observations on the Difficulty of Reconciling Free Speech and Reputation in the Emerging Global Village,* 62 Wash. & Lee L. Rev. 339 (2005); J. Q. Whitman, *Enforcing Civility and Respect:  Three Societies*, 109 Yale L. J. 1279 (2000); E. J. Eberle, *Human Dignity, Privacy, and Personality in German and American Constitutional Law*, 1997 Utah L. Rev. 963; S. Fifer y M. Sachs, The Price of International Free Speech*: Nations Deal with Defamation on the Internet*, 8 DEPaul-LCA J. Art & Ent. L. 1 (1997); E. M. Smith, *Reporting the Truth and Setting the Record Straight:  An Analysis of U.S and Japanese Libel Laws*, 14 Mich. J. Int'l L. 871 (1993); J. A. Ourvan, *Damage Control:  Why Japanese Courts Should Adopt a Regime of Larger Libel Awards*, 21 N.Y.L. Sch. J. Int'l & Comp. L. 307 (2002); R.L. Weaver y D. F. Partlett, *Defamation, Free Speech, and Democratic Gobernance,* 50 N.Y.L. Sch. L. Rev. 57 (2005-2006).

[18] Por ejemplo, véase:  D. A. Anderson, *Is Libel Law Worth Reforming*?, 140 U. Pa. L. Rev. 487 (1991); Krotoszynski, *op. cit.*; R. A. Epstein, *Was New York Times* v. *Sullivan Wrong*?, 53 U. Chi. L. Rev. 782 (1986).  En cambio, véase: R. L. Weaver y G. J. G. Bennett, *Is the New York Times "Actual Malice" Standard Really Necessary?  A Comparative* Perspective, 53 La. L. Rev. 1153 (1993).  También véase Weaver y Partlett, *op. cit.*

[19] La importancia del contexto socio-jurídico en el análisis del derecho comparado puede apreciarse, por ejemplo, en: Whitman, *op. cit.*; Eberle, *op. cit.*; Smith, *op. cit.*

de imparcialidad al que alude la Opinión de Disidente con el principio de *stare decisis*, con la Primera Enmienda de la Constitución estadounidense, y con la cultura política de este país?

## V.

El mecanismo de sentencia sumaria es parte integral de la protección constitucional disponible al demandado en casos de difamación. Veamos los contornos de esta norma procesal, cuyo propósito es evitar que la prolongación de los litigios tenga un impacto disuasivo sobre la libertad de expresión. *Villanueva* v. *Hernández Class*, supra, a las págs. 643-644; *Oliveras* v. *Paniagua Diez*, supra, a la pág. 269; *García Cruz* v. *El Mundo*, supra, a la pág. 182. Véase, además *Pérez Rosado* v. *El Vocero*, supra, a las págs. 445-446; *Clavell* v. *El Vocero*, supra, a las págs. 696-697.

En toda solicitud de sentencia sumaria, incumbe al promovente demostrar la procedencia del remedio solicitado. Así, quien solicita la desestimación sumaria de una demanda por difamación viene obligado a establecer que ello procede en derecho. Hay dos formas de lograrlo. Se puede demostrar, en primer lugar, que existen hechos no controvertidos capaces de establecer la ausencia de toda causa de acción, ya sea porque se incumplen los requisitos pertinentes o se configura una defensa afirmativa. La evidencia a utilizarse consiste de las declaraciones juradas y prueba documental admisible que el promovente someta con su moción o que obren en autos. *Pérez Rosado* v. *El Vocero*, supra, a la pág. 446. Véase, además:

*Asociación de Pescadores de Punta Figueroa* v. *Marina de Puerto del Rey*, 155 D.P.R. 906 (2001); *Jusino Figueroa* v. *Walgreens of San Patricio*, 155 D.P.R. 560 (2001); *PFZ Properties* v. *Gen. Accident Insurance Co.*, 136 D.P.R. 881 (1994); *Medina Morales* v. *Merck, Sharp & Dhome Química de P.R.*, 135 D.P.R. 716 (1994).

La segunda alternativa del demandado-promovente es persuadir al tribunal que su adversario carece la prueba necesaria para establecer los requisitos de la causa de acción. Es decir, debe establecerse que resulta innecesaria la vista en su fondo porque el demandante ha tenido la oportunidad de realizar un adecuado descubrimiento de prueba y, aún así, carece la evidencia necesaria para demostrar que el demandado le causó un daño al hacer expresiones difamatorias, falsas y con malicia real. *Pérez Rosado* v. *El Vocero*, supra, a las págs, 446-446. Véase, también: *Medina Morales* v. *Merck, Sharp & Dhome Química de P.R.*, supra, a las págs. 733-734.

Una vez el promovente cumple con su obligación inicial de justificar la desestimación sumaria, la carga probatoria se transfiere al demandante. Cuando la desestimación se haya solicitado debido a la ausencia de una causa de acción, el demandante debe controvertir los hechos pertinentes con declaraciones juradas o prueba documental admisible. Si la desestimación se hubiera solicitado por insuficiencia de la prueba, el demandante viene obligado a producir la evidencia que, de ser admitida y creída, probaría los elementos constitutivos de la causa de acción.

También podría establecer la ausencia de un descubrimiento de prueba adecuado. *Pérez Rosado* v. *El Vocero*, supra, a las págs. 448-450.

Es en la segunda etapa procesal reseñada que el mecanismo de sentencia sumaria adquiere su particular rigor ante una acción por difamación. Adviértase, por ejemplo, que al promovido no le benefician las meras alegaciones de su demanda. Así mismo, el tribunal no examinará el récord evidenciario de la forma más favorable al demandante promovido. *Pérez Rosado* v. *El Vocero*, supra, a la pág. 446.

## VI.

En el caso de autos, la pregunta a dirimir es si el demandante, Cabrero Muñiz, logró rebatir la moción de sentencia sumaria del periódico demandado. Dicha moción estuvo predicada en la ausencia de evidencia capaz de establecer los requisitos aplicables a un funcionario público. Para rebatir tal moción de desestimación sumaria el demandante viene obligado a establecer una de dos cosas: (1) la ausencia de un proceso adecuado de descubrimiento de prueba; (2) la disponibilidad de evidencia que, al ser admitida y creída, bastará para establecer **clara y convincentemente** los requisitos de su causa de acción.

Cabrero Muñiz sostiene que *El Nuevo Día* publicó seis artículos con expresiones falsas, difamatorias y dañinas, obras todos de la periodista Magdalys Rodríguez. Los primeros cinco aparecieron publicados el 15, 16, 24, 25 y 29 de octubre de 1997, mientras que el sexto figuró en la

edición del 2 de diciembre de 1997.  Obran en autos, *inter alia* un extenso escrito que el demandante sostiene haber preparado mientras era Síndico de la CRUV, una extensa *Moción Solicitando Sentencia Sumaria Parcial de El Nuevo Día*, así como las transcripciones parciales de varias deposiciones y de una conversación entre el demandante y la periodista habida el 21 de octubre de 1997.

Hemos examinado la evidencia disponible y no estamos convencidos de que ésta podría cumplir los requisitos constitucionales.

**A.**

Antes de examinar la evidencia específica que ofrece el demandante, conviene adelantar una evaluación general de la controversia planteada, a fin de recalcar su trascendencia democrática.

*El Nuevo Día* publicó varias noticias donde se indicó que el demandante y entonces Síndico a cargo de la liquidación de la CRUV, Cabrero Muñiz, había participado en un esquema de favoritismo y había incumplido su deber legal de maximizar el valor de los activos a su cargo.  La principal evidencia señalada era que dos personas con fuertes vínculos al partido de turno, una de las cuales evaluó y confirmó el nombramiento del Síndico --mientras fungía como Presidente de la Comisión de Nombramientos del Senado-- habían adquirido interés en bienes de la CRUV, bienes que dos o tres meses después valoraron y vendieron a un precio mayor.  El demandante no disputa seriamente la identidad de los compradores, sus vínculos y funciones

políticas, los precios de las transacciones o valoraciones, etc. Véase, *e.g.*, Apéndice págs. 287-289 y 296-297. Su evidencia procura establecer principalmente, que una investigación adecuada hubiera revelado que las ventas se hicieron conforme los requisitos de ley y que no hubo la intención de favorecer a persona alguna.

A nuestro juicio, las circunstancias indicadas establecen que el putativo incumplimiento y favoritismo eran una **opinión**, no un hecho refutable con evidencia objetiva. Respetuosamente advertimos el riesgo de permitir, ante la **apariencia** de irregularidad, que cualquier ciudadano capaz de **inferir** su realidad se exponga a un largo y costoso litigio, e incluso, a un fallo condenatorio. En este tipo de caso, las partes han tenido su día en corte --la corte de opinión pública.

**Estas expresiones las hacemos con pleno conocimiento de sus consecuencias para los funcionarios y figuras públicas. Evidentemente, la discusión en los medios de nuestro país, no menos que en sus cafetines, hogares y foros afines, puede ser cruel en demasía. Tal es el precio de la igualdad y la libertad política, valores que subyacen la normativa constitucional en materia de difamación.** Nos expresamos, también, sin ánimo de juzgar en sentido alguno la conducta del demandante, Cabrero Muñiz.

**B.**

Veamos, entonces, la evidencia que ostenta el demandante. De ella no surgen hechos cuya credibilidad podría justificar una determinación de que el demandado

incurrió en expresiones difamatorias, falsas y con malicia real.

**1.**

El demandante considera que *El Nuevo Día* publicó una serie de "mentiras". Por ejemplo, el 16 de octubre de 1997 se publicó lo siguiente:

> El Síndico dijo que vendió los apartamentos al precio de tasación, que es el requisito de ley. Pero no contestó quien fue el tasador. Sólo dijo: 'un tasador cualificado.' Este diario solicitó copia de las subastas, pero Cabrero solo respondió que quien conozca del proceso de ejecución de propiedades sabe que luego se vende en subasta a la misma vez.

El demandante objeta estas expresiones, *inter alia*, porque en "ningún momento la periodista ha pedido la tasación." Pero la cita objetada no dice que la periodista solicitó copia de la tasación; dice que solicitó copia de unas subastas. Apéndice, pag. 301.

Este artículo de 16 de octubre ofrece otro ejemplo de las mentiras que imputa el demandante. El periódico señala que, según Cabrero Muñiz, la Oficina del Síndico había publicado unos edictos con relación a determinadas ventas. Luego señala que éste no pudo proveer copias de los edictos porque, según dijo, "eso fue hace cuatro años." El demandante responde, entre otras cosas:

> Es una falsa representación decir que no pude proveer copia de los edictos sin importancia solicitados, porque "eso fue hace cuatro años." La verdadera representación debió ser que caballerosamente le atendí a pesar de la limitación de tiempo, no tenía la documentación en mi poder por estar los expedientes de ventas en el Area de Ventas de la Ave. Barbosa y siendo un asunto viejo requiere de una búsqueda en un expediente legal cerrado.

Apéndice, pág. 300.   Evidentemente, aquí la palabra "mentira" adquiere un significado tan amplio que daría al traste con toda función editorial.

Como último ejemplo, veamos el artículo de 25 de octubre de 1997.  Este señala, *inter alia*, que el Director del Banco Gubernamental de Fomento desmintió la aseveración del demandante de que se habían vendido sobre $1 billón en propiedades, aseveración que supuestamente hizo Cabrero Muñiz en una entrevista con la periodista celebrada el 21 de octubre de 1997.  Aquel sostiene que ésta publicó a sabiendas un hecho falso:  no solo tenía un listado de todas las ventas, sino que él enfatizó en la entrevista que los $1.3 billones eran el total de **liquidación**, no de **venta**, pues incluía una transacción con respecto a los residenciales públicos.  Apéndice, págs. 224-225, 229-230 y 319.  Sin embargo, la transcripcion de dicha entrevista revela el siguiente intercambio:

PERIODISTA:  O sea, que ya se ha **vendido** casi todo.

LIC. CABRERO:  Si.

PERIODISTA:  1.3 que usted heredó. . .

LIC. CABRERO:  Si, seguro, de los más, de las más atractivas yo te diría.

Apéndice, pág. 213.  El demandante dijo lo que el periódico le imputó.  Además, los autos no revelan que sus explicaciones con respecto a los residenciales públicos fueran tan claras y enfáticas como para justificar la inferencia de que Magdalys Rodríguez tuvo serias dudas al

hacer la imputación, como el demandante sugiere.[20]  De

hecho, la postura del demandante resulta imprecisa aún en

virtud de la evidencia presentada.[21]

**2.**

A menudo el demandante ofrece declaraciones de las

cuales es difícil colegir evidencia alguna de falsedad

difamatoria hecha con malicia real.  Por ejemplo, indica

que el 22 de octubre de 1997 se comunicó con la periodista

y le solicitó que publicara ciertas correcciones, pues ya

tenía disponibles las fuentes necesarias para comprender la

verdad y percatarse de que "había publicado un sinnúmero de

mentiras y había tergiversado la verdad en diversas

ocasiones."  Añade que insistió posteriormente en la

publicación de un artículo con su punto de vista, así como

una disculpa pública, llegando al extremo de solicitar la

---

[20] Cabrero Muñiz destaca que a la pregunta, "cuánto tenían en propiedades ustedes para vender?", respondió lo siguiente:  "Originalmente, incluyendo los residenciales públicos, . . . lo que pasa es que estaban los residenciales públicos, los activos ascendían a 1.3 millones [sic]."  Luego explicó: "[la cifra] puede ser cerca de $1.3 billones.  Eso podemos buscar al Comptroller [sic], pero es por ahí, por $1.3 billones incluyendo los residenciales públicos.  Residenciales públicos, eso se hizo una. . . " Apéndice, pág. 318.

[21] Cabrero Muñiz señala que las ventas enumeradas en el informe entregado a la periodista alcanzan los $56 millones.  También señala, inconsistentemente, que el valor en libros de los residenciales públicos era cerca de $1 billón y $1.3 billones.  Apéndice, pág. 319, 225 y 229.  Tales expresiones resultan confusas.  Por ejemplo, si los residenciales valían $1 billón y las ventas $56 millones, podría entenderse que hubo una exageración de $244 millones en el total de las ventas, circunstancia que apoyaría la imputación esencial del periódico, *viz.*, que el Director del Banco Gubernamental de Fomento contradijo una exageración del Síndico.

inhibición de Magdalys Rodríguez. Sin embargo, en ninguno de estos señalamientos se demuestra que el periódico omitió informar la posición del demandante, quien, ciertamente, no está facultado para tomar las decisiones editoriales de *El Nuevo Día*.[22]

La evidencia del demandante contiene otras declaraciones que distan de establecer la existencia de expresiones falsas y difamatorias hechas con malicia real. Por ejemplo, ante una manifestación del periódico sobre los deberes legales del Síndico, objeta el demandante que la periodista "se pone el sombrero de abogada" para "levantar dudas de legalidad" y así "revoca" al Secretario de Justicia y al personal especializado de la Contralor. Es decir, el demandante considera que hubo falsedad y malicia real porque la periodista opinó sobre un asunto legal sin haber estudiado derecho y en aparente contradicción a las opiniones del Secretario de Justicia y de la Contralor. Apéndice, pág. 312.

### 3.

El planteamiento más serio del demandante, postura que acertadamente enfatiza la Opinión Disidente, es que los autos revelan una decisión del rotativo de no adquirir, mediante el cotejo de las fuentes más obvias, el conocimiento de los hechos que hubieran revelado la

---

[22] Cabe añadir que, a nuestro juicio, los señalamientos números 5, 6 y 8 de la Opinión Disidente no contienen evidencia independiente de expresiones falsas, difamatorias y maliciosas.

falsedad de la información difamatoria.

Ahora bien, la evidencia del propio demandante revela que hubo una investigación. La periodista conversó con el en varias ocasiones, recibió documentos y solicitó otros. También se entrevistó con un funcionario del Banco Gubernamental de Fomento y con ciertos corredores de bienes raíces. El texto de los artículos publicados revela que el periódico examinó al menos parte de la información recibida, sin excluir totalmente la que destacó el demandante, ni su punto de vista.

Cabrero Muñiz responde que la investigación fue deliberadamente inadecuada. Su argumento a tales efectos parece ser el siguiente. Primero, los artículos de *El Nuevo Día* le imputaron haber participado en un esquema mediante el cual personas cercanas al partido de turno procuraron su nombramiento como Síndico de la CRUV y luego compraron bienes de dicha entidad sin pagar su verdadero valor. Varios de estos artículos se publicaron después de que el demandante conversara con la periodista y le entregara una serie de documentos. Dicha información demostraba que la obligación legal del Síndico era vender las propiedades por tasación, y que así ocurrió. Por ende, la referida imputación era falsa y reflejó una decisión de no adquirir y publicar la información correcta.

La razón no acompaña al demandante. Su evidencia no demuestra la supuesta decisión de evitar la verdad, sino que revela una diferencia de criterios con la periodista y una serie de imputaciones imprecisas del demandante.

Veamos un ejemplo característico. Se comienza con una cita de la noticia publicada el 24 de octubre: "El Síndico de la CRUV, Antonio Cabrero, vendió más de $1,000 millones en propiedades sin anuncios al público y sin cumplir el mandato de ley de maximizar el valor en las ventas." Luego se señalan los siguientes hechos, *inter alia*: que la periodista tenía conocimiento de que "la ley y el Reglamento no requieren publicación de anuncios"; que el Reglamento contempla la facultad de vender por tasación; y que la Oficina de la Contralor había considerado lícitas la venta por tasación en "los procedimientos de venta mencionados". Apéndice, págs. 311-312.

Los hechos señalados no permiten la inferencia de que hubo una publicación falsa, libelosa y con grave menosprecio a la verdad. Específicamente, el primer hecho que señala el demandante no contradice la cita objetada, pues ésta no indica que la ley exigía anuncios. Con respecto al segundo hecho, el periódico pudo razonablemente pensar que había la obligación, no sólo de vender por tasación, sino de procurar el mejor rendimiento posible. El tercer hecho, además de ser sumamente impreciso, implica falsedad y grave menosprecio a la verdad sólo para quien supone que el visto bueno de la Contralor es punto final a toda discusión sobre el cabal cumplimiento de los funcionarios públicos con sus deberes. En fin, las contradicciones entre la cita objetada y los hechos que destaca el demandante son inexistentes o responden a una diferencia de opinión. Ello es claramente insuficiente

para evitar se dicte sentencia sumaria en su contra.

Aún si la evidencia del demandante estableciera la supuesta decisión de no investigar, el récord no sugiere que la gestión del periódico fuera tan deficiente como para justificar la inferencia de malicia real. A esta conclusión llegamos sin tener que precisar las faltas investigativas excepcionales que permitirían tal inferencia al palio de nuestra Constitución. Basta con observar que la evidencia del demandante tan siquiera demuestra el tipo de circunstancias que observamos en *Harte-Hanks Communications v. Connaughton*, supra.

En *Harte-Hanks*, se recordará, el periódico demandado manifestó que Connaughton realizó una entrevista principalmente con Patsy Stephens, detuvo la grabación en múltiples ocasiones para ofrecerle recompensas, y reveló su intención de utilizar la información para chantajear a su rival en una contienda electoral. El periódico no escuchó la cinta de grabación (la cual estaba disponible), no entrevistó a Stephens, y confió en una persona cuyas declaraciones fueron inconsistentes, vacilantes y refutadas por los demás testigos (cercanos al demandante). Todo ello a pesar de que hubo tiempo para investigar. Gestiones tan sencillas como escuchar la cinta y entrevistar a Stephens --quien era hermana de la informante-- hubieran corroborado u ocasionado serias dudas con respecto a los hechos publicados.

La evidencia de Cabrero Muñiz está huérfana de tales circunstancias. No existe una fuente vacilante e

inconsistente. Varios de los artículos requerían publicación inmediata, como, por ejemplo, el que informó sobre las alegaciones del ex-Representante Francisco Zayas Seijo. No se han identificado precisamente los hechos difamatorios que el periódico publicó a pesar de tener a su disposición el tiempo y las fuentes que permitirían su objetiva refutación. Al contrario, la periodista conversó con el demandante en varias ocasiones, recibió documentos, solicitó otros, entrevistó a un funcionario del Banco Gubernamental de Fomento, entrevistó a corredores de bienes raíces, y examinó al menos parte de la información recibida, sin excluir totalmente la que destacó el demandante, ni su punto de vista. En fin, fueran cuales fueran los motivos, las decisiones deliberadas y las faltas investigativas del periódico, es imposible sostener que la evidencia revelaría su **grave** menosprecio a la verdad.[23]

## VI.

En virtud de lo antes expresado, estamos conforme con la Sentencia dictada por este Tribunal en la cual se revoca la *Resolución* del foro inferior y se ordena la desestimación de la demanda instada contra *El Nuevo Día*.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

---

[23] En vista de las conclusions a las cuales hemos llegado, no evaluaremos la defense invocada del informe justo y verdadero.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Antonio J. Cabrero Muñiz
          Recurrido

              v.

    Francisco   Zayas   Seijo;
Fulano  de  Tal  y  la  Sociedad         CC-2004-767
Legal de Gananciales Compuesta
por   Ambo;   El   Día,   Inc.;
Aseguradoras A y B

    El Día, Inc.
          Peticionario

Opinión de Disidente emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 5 de abril de 2006.

El presente recurso nos brindó la oportunidad de expresarnos y desarrollar la norma ya pautada sobre la forma en que funciona el mecanismo de sentencia sumaria en casos que involucran el ejercicio de la libertad de prensa. Ya en Pérez Rosado v. El Vocero de P.R.[24], resolvimos que cuando un periódico presenta una moción de sentencia sumaria tiene, como cualquier otro demandado promovente, la carga inicial de la prueba para apoyar las defensas alegadas. El presente caso nos brindó la oportunidad de expresarnos respecto a  la prueba que debe

_____

[24] 149 D.P.R. 427 (1999).

presentar el demandante promovido en la etapa de la sentencia sumaria, para demostrar prima facie la existencia de controversia de hechos materiales y esenciales sobre **malicia real** de parte del rotativo, en la publicación de la noticia alegadamente libelosa. Se nos solicitó la revocación de una resolución emitida por el Tribunal de Apelaciones, que denegó la expedición del auto de *certiorari*, presentado por uno de los codemandados de autos. Al así hacerlo, dicho foro apelativo no intervino con una resolución del Tribunal de Primera Instancia, Sala Superior de Bayamón, que denegó una moción de sentencia sumaria presentada por un medio de prensa escrita. Dicha moción pretendía la desestimación del pleito instado en su contra por el allí demandante. Disentimos del curso de acción de la Mayoría de revocar la Resolución recurrida.

I

El propósito de la libertad de prensa es que sirva como sustituto de la presencia directa del pueblo, por ser su derecho el estar adecuadamente informado de lo que acontece en su gobierno y en la gestión de los funcionarios públicos. Dicha protección pretende proteger el interés de la ciudadanía a estar debidamente informada. Permite fomentar el debate vigoroso, precisamente en pro de ese derecho del individuo a estar informado. Esto es imprescindible para la vivencia de nuestra democracia participativa. No obstante, la referida protección constitucional no puede extenderse para que la prensa

deliberadamente ofrezca sólo la versión de una parte de lo acontecido, que es motivo de debate político, cuando ello produce una falta de información sobre la totalidad de las versiones vertidas sobre el asunto por todas las partes envueltas. Esto cobra mayor importancia cuando tal conducta puede producir la difamación de un funcionario público cuya función de gobierno esta relacionada con el asunto objeto del debate político. No se debe comprometer la verdad de lo acontecido, y por ende la totalidad de la información a que tiene derecho el pueblo, publicando solo el punto de vista de una parte, objeto del referido debate político. Es imprescindible que todos los ángulos del debate político sean informados a la ciudadanía. Actuar en forma contraria frustra el objetivo de la libertad de prensa de servir como vehículo para que el ciudadano se mantenga informado de la verdad del contenido del debate político, y pueda ejercer sus derechos políticos en una forma informada e inteligente. Todo esto cobra mayor importancia y relevancia cuando esta cuestionada, en el debate político, la gestión de un funcionario público, por tener éste un deber de fiducia para con el pueblo de llevar a cabo en forma adecuada tal gestión, en beneficio del interés público.

## II

La difamación en el ámbito civil se ha definido como desacreditar a una persona publicando cosas falsas contra

su reputación.[25] En Puerto Rico, hemos reconocido la acción de daños y perjuicios por difamación. Ésta es una acción torticera genérica que incluye tanto el libelo como la calumnia.[26]

En los casos de libelo se enfrentan dos derechos constitucionales de la más alta jerarquía en nuestro ordenamiento, a saber, el derecho a la libertad de expresión o prensa y el derecho a la intimidad. Por ello, estos casos requieren del juzgador un delicado balance de intereses. Por un lado, se encuentra el interés de la ciudadanía en estar debidamente informada y a que se fomente un debate vigoroso sobre las cuestiones de interés público, elementos imprescindibles para la preservación de una democracia participativa. Por otro lado, están la protección contra ataques abusivos a la honra, la reputación, la vida privada y familiar, y la inviolabilidad de la dignidad del ser humano.[27] Como señalamos en Méndez Arocho v. El Vocero de P.R.[28], la fuente primaria de protección contra injurias es el artículo II, sec. 8 de la Constitución de Puerto Rico.[29]

---

[25] I. Rivera García, Diccionario de Términos Jurídicos, New Hapshire, Equity Publishing Corp., 1985.

[26] Pérez v. El Vocero de P.R., *supra*; Ojeda v. El Vocero de P.R., 137 D.P.R. 315 (1994).

[27] Pérez v. El Vocero de P.R., *supra*.

[28] 130 D.P.R. 867 (1992).

[29] Documentos Históricos, 1 L.P.R.A., Art. II, Sec.8, pág. 301. Este artículo desplaza a la Ley de Libelo y Calumnia de 1902, 32 L.P.R.A. sec. 3141 et seq., la cual sobrevive

Para que prospere una acción civil por libelo o difamación, se requiere que la persona que alegue la difamación, pruebe lo siguiente: (1) la falsedad de la información publicada; (2) los daños reales sufridos a causa de dicha publicación; (3) si el demandante es figura privada, hay que demostrar que las expresiones fueron hechas negligentemente, y (4) si el demandante es figura pública, tiene que probar que la información fue publicada con **malicia real**, es decir, a sabiendas de su falsedad o con grave menosprecio de si era falsa o no.[30]

De otra parte, la sentencia sumaria es un mecanismo procesal que confiere al juzgador discreción para dictar sentencia sin necesidad de celebrar una vista evidenciaria. El tribunal, en el ejercicio de su discreción, puede dictarla sobre la totalidad de una reclamación o sobre cualquier controversia comprendida en ella, cuando de los documentos admisibles en evidencia que se acompañan con la solicitud, o que obran en el expediente del tribunal, surge que no existe una legítima disputa de hechos materiales y

---

solamente en tanto y en cuanto es compatible con la Constitución. Véase, Pérez v. El Vocero de P.R., *supra*, Méndez Arocho v. El Vocero de P.R., *supra*.

[30] Pérez v. El Vocero de P.R., *supra*; Garib Bazain v. Clavell, 135 D.P.R. 475 (1994); Villanueva v. Hernández Class, 128 D.P.R. 618 (1991); González Martínez v. López, 118 D.P.R. 190, 192-193 (1987); Torres Silva v. El Mundo, Inc., 106 D.P.R. 415 (1977).

esenciales que tenga que ser dirimida en vista evidenciaria y que sólo resta aplicar el derecho.[31]

En el marco de nuestra jurisprudencia sobre libelo, hemos expresado que aunque los tribunales vacilan en dictar sentencias en forma sumaria, tal mecanismo es parte integral de la protección constitucional disponible a los demandados en este tipo de litigios.[32] El fundamento de ello es que la prolongación de esta clase de litigios puede tener un efecto disuasivo sobre el ejercicio de los derechos de libertad de prensa y expresión.[33]

Por ello, cuando el rotativo periodístico presenta una moción de sentencia sumaria, se le exige al demandante un mayor rigor en su oposición para que pueda derrotar la

_____

[31] Regla 36 de Procedimiento Civil, 32 L.P.R.A., Ap. III, R. 36. Véase además, Pérez v. El Vocero de P.R., supra; Audiovisual Lang. v. Sist. Est. Natal Hnos., 144 D.P.R. 563 (1997); Mercado Vega v. U.P.R., 128 D.P.R. 273, 281 (1991); Nazar Rizek v. Hernández, 123 D.P.R. 360, 378 (1989); Corp. Presiding Bishop CJC of LDS v Purcell, 117 D.P.R. 714 (1986).

[32] Pérez v. El Vocero de P.R., 149 D.P.R. 427 (1999); Clavell v. El Vocero de P.R., 115 D.P.R. 685 (1984); García Cruz v. El Mundo, Inc., 108 D.P.R. 174 (1978).

[33] Este trato preferencial ha sido criticado por tratadistas puertorriqueños, como Cuevas Segarra y Hernández Colón, por entender que, toda vez que la prueba de malicia real pone en entredicho el estado mental del demandado al efectuar la publicación, no se presta automáticamente para el uso de la disposición sumaria. Véase, J. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan Pubs. J.T.S., 2000, Vol.I, págs. 596-598 y R. Hernández Colón, Práctica Jurídica de Puerto Rico – Derecho Procesal Civil, San Juan, 1997, págs. 205-206. Este último entiende que este Tribunal ha fundamentado dicho estándar en una ficción jurídica, "contraria a toda realidad", de que la prolongación de un pleito contra el periódico puede tener un efecto paralizante o disuasivo sobre el ejercicio de la libertad de prensa.

misma. No obstante, hemos resuelto que aunque la sentencia sumaria sea parte de la protección constitucional de los medios de comunicación, en casos de libelo, y aunque se exija un mayor rigor para derrotar una solicitud de sentencia sumaria, **no significa que por el mero hecho de tratarse de un periódico, tenga derecho a un dictamen favorable.** Tampoco significa que deban alterarse las disposiciones de procedimiento civil que regulan el funcionamiento de este mecanismo procesal extraordinario. El periódico, **como cualquier otro promovente**, tiene la carga inicial de la prueba para apoyar las defensas alegadas.[34]

De conformidad con lo anterior, en Pérez v. El Vocero de P.R., *supra*, expresamos que el periódico tiene dos (2) maneras de cumplir con su carga probatoria inicial al presentar su moción de sentencia sumaria. Primero, puede establecer, ya sea a base de los documentos que presenta o de los que obran en autos, que no existe controversia real sustancial en cuanto a ningún hecho material y que, como cuestión de derecho, procede dictar sentencia a su favor. En reclamaciones por libelo, bastaría con que el periódico pueda demostrar que esta incontrovertido la ausencia de alguno de los elementos esenciales de la acción presentada. Se trata de que el periódico pueda sostener como

---

[34] Pérez v. El Vocero de P.R., *supra*.

incontrovertibles los hechos materiales que activan alguna de las defensas que lo cobijan en reclamaciones de libelo.[35]

El periódico puede, además, cumplir su carga inicial como promovente de una moción de sentencia sumaria, sosteniendo su solicitud en que la parte demandante no cuenta con evidencia suficiente para probar su caso. Para que el Tribunal de Primera Instancia pueda dictar sentencia sumaria por insuficiencia de la prueba de la parte demandante, el periódico promovente tendrá que persuadirlo de **cada uno** de los siguientes elementos: (i) que no es necesario celebrar una vista evidenciaria; (ii) que el demandante promovido no cuenta con evidencia suficiente para probar algún hecho material y esencial, y (iii) que, como cuestión de derecho, procede la desestimación de la reclamación.[36]  Al evaluar una solicitud de sentencia sumaria en la modalidad de insuficiencia de la prueba de la parte demandante, resulta indispensable que se le haya brindado al promovido una amplia oportunidad de realizar un amplio y adecuado descubrimiento de prueba.  Por ello, como parte de su obligación, como cuestión de umbral, el promovente de una moción de sentencia sumaria, por insuficiencia de la prueba de la parte demandante, tiene que establecer afirmativamente que se ha llevado a cabo por las partes un descubrimiento de prueba completo, adecuado y

---

[35] Íd., págs. 446-448.

[36] Íd., pág. 447.  Véase además, Medina v. M.S. & D. Química P.R., Inc., 135 D.P.R. 716 (1994).

apropiado, o sea, que han explorado concienzudamente la posibilidad de la existencia de evidencia admisible. Se trata de que el promovente de la moción de la sentencia sumaria coloque al tribunal en la posición de evaluar la adecuacidad del descubrimiento de prueba realizado hasta ese momento y de concluir que el demandante promovido no cuenta con evidencia suficiente.[37]

Una vez el rotativo de prensa cumple con su carga inicial, como promovente de la moción de sentencia sumaria, se transfiere la carga al promovido para demostrar la existencia de controversias sobre hechos materiales y esenciales que requieran juicio plenario para ser dilucidadas. Este es el momento procesal en que el juez exigirá mayor rigor al promovido. Para derrotar la moción de sentencia sumaria del periódico, el promovido tiene que: (i) controvertir los hechos materiales que sostienen la defensa levantada por el periódico; (ii) cuando la moción alude a la insuficiencia de la prueba, debe demostrar que cuenta con evidencia suficiente que, de ser admitida y creída en su día, probaría los elementos constitutivos de negligencia o **malicia real** en casos de figuras o funcionarios públicos, **o** (iii) debe establecer que aún no ha podido hacer un descubrimiento de prueba adecuado que le permita obtener evidencia admisible para sostener sus

---

[37] Íd.

alegaciones. Cabe señalar que la cuestión sobre suficiencia de prueba de **malicia real** es una de derecho. [38]

### A. La prueba necesaria de malicia real

Como expresamos previamente, para que prospere una acción civil por libelo instada por una figura o funcionario público, además de otros elementos, se requiere que éste pruebe que la información fue publicada con **malicia real**, es decir, a sabiendas de su falsedad o con grave menosprecio de si era falsa o no.[39]

Hemos resuelto que es necesario que el demandante demuestre la existencia de malicia real mediante una **prueba clara y convincente**. Tiene que surgir de hechos específicos. No es suficiente afirmar meramente que la

---

[38] Véase, Garib Bazain v. Clavell, *supra*; Oliveras v. Paniagua Diez, 115 D.P.R. 257 (1984); García Cruz v. El Mundo, Inc., *supra*. Además, el promovido puede derrotar la solicitud de sentencia sumaria por insuficiencia de la prueba del periódico demostrándole al tribunal que no ha podido realizar un descubrimiento de prueba adecuado. Véase Pérez v. El Vocero de P.R., *supra*. En Medina v. M.S. & D. Química P.R., Inc., *supra*, resolvimos que un promovido puede derrotar una moción de sentencia sumaria por insuficiencia de la prueba demostrando que la moción es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado. Al reconocer la importancia de permitir un descubrimiento de prueba adecuado antes de resolver una moción de sentencia sumaria por insuficiencia de la prueba, lo hicimos conscientes de que acoger una moción de sentencia sumaria de forma prematura puede tener el efecto de privar al demandante promovido de sus derechos sin un debido proceso de ley.

[39] Pérez v. El Vocero de P.R., *supra*; Garib Bazain v. Clavell, *supra*; Villanueva v. Hernández Class, *supra*; González Martínez v. López, *supra*; Torres Silva v. El Mundo, Inc., *supra*.

publicación fue maliciosa.[40]   La malicia real nunca se puede presumir, por lo que le corresponde probar que el demandado tuvo serias dudas sobre la certeza de la información y que albergaba un grado de conciencia de la probable falsedad.[41]

Cierto es que no podemos encerrar el grave menosprecio a la verdad al que se refiere la doctrina en una definición inflexible.   Por ello, inevitablemente, la determinación de lo que constituye **grave menosprecio a la verdad** se hará mediante un análisis caso a caso.   Ello obedece a una razón sencilla: la determinación de lo que constituye malicia real dependerá de los hechos particulares de cada caso.   No obstante, ello no es óbice para que podamos darle contenido a dicho estándar constitucional.

Hemos expresado que prueba de mala voluntad u odio no satisface de por sí el grado constitucionalmente requerido de la prueba de **malicia real.**[42]   Además, el grave menosprecio a que se refiere la doctrina, se trata de prueba suficiente que permita concluir que el demandado

_____

[40] Clavell v. El Vocero de P.R., *supra*, pág. 696; García Cruz v. El Mundo, Inc., *supra*, págs. 180 y 183.

[41] Soc. de Gananciales v. López, *supra*, pág. 115; García Cruz v. El Mundo, Inc., *supra*, págs. 180-181.

[42] García Cruz v. El Mundo, Inc., *supra,* citando a Henry v. Collins, 380 U.S. 356 (1965); Rosenblatt v. Baer, 383 U.S. 75 (1966); Eckhardt, Jr. & McKey, Caldero v. Tribune Publishing Co.: Substantive and Remedial Aspects of First Amendment Protection for a Reporter´s Confidential Sources, 14 Idaho L. Rev. 21 (1977).

abrigaba serias dudas sobre la certeza y veracidad de la información publicada.[43]

La publicación no puede ser el resultado de una decisión deliberada de la prensa de no adquirir el conocimiento de hechos que puedan confirmar la probable falsedad de lo publicado. Es decir, aunque el dejar de investigar, por si solo, no sostiene una determinación de **malicia real**, entendemos que el evitar deliberada y **decididamente** la búsqueda de la verdad podría constituir grave menosprecio a la verdad. También podría inferirse la malicia real por el juzgador, si la investigación realizada por el periódico en cuestión fue deliberadamente inadecuada.[44] En este contexto, la omisión deliberada del reportero, de conseguir las fuentes disponibles **más obvias de corroboración o refutación**, podría evidenciar un grave menosprecio a la verdad.[45] Ello puede ser demostrado por un intento real del demandante de ofrecer su versión de lo sucedido a la prensa y, a pesar de su intento, el reportero, cuya responsabilidad es buscar e informar la verdad, no hace intento o gestión alguna para responder a tal reclamo y por ende recibir la misma.

_____

[43] Íd., pág. 181. Véase además, Gertz v. Robert Welch, Inc. 418 U.S. 323 (1974); Garrison v. Louisiana, 379 U.S. 727 (1964).

[44] Véase, Curtis Publishing, Co. v. Butts, 388 U.S. 130 (1967); Vanderburg v. Newsweek, Inc., 507 F.2d 1024 (5th Cir. 1975).

[45] Alioto v. Cowles Communications, Inc., 519 F. 2d 777 (9th Cir. 1975). Véase además, Kuhn v. Tribune Republican Publishing Co., 637 P.2d 315 (1981).

Con relación a aquellas noticias con alto potencial de ser difamatorias, los medios deben ejercer **un grado mayor de diligencia** y sopesar los intereses en conflicto. Una conducta errática que responda al descuido o la negligencia, así como un acto u omisión deliberado o intencional, puede destruir reputaciones, la paz y tranquilidad personal y familiar, y hasta poner la seguridad y la vida de personas en grave peligro. La razonabilidad en el proceso de publicación y cotejo de la veracidad de noticias con impacto difamatorio se determinará conforme a las circunstancias particulares de cada caso tomando en consideración la norma antes expresada. El balance de los intereses constitucionales en conflicto no exige menos.[46]

Del mismo modo, el hecho de que el estándar de **malicia real** requiera una determinación del estado mental del demandado al momento de la publicación, no significa que el juzgador de los hechos está limitado por la propia versión del demandando de lo que estaba en su mente al momento de la publicación. Ello responde, obviamente, al hecho de que ningún demandado, como regla general, admitirá voluntariamente su actuación como una que responda a un grave menosprecio a la verdad.[47] Por ello, al demostrar la

---

[46] Pérez v. El Vocero de P.R., *supra*, págs. 452-453.

[47] Véase, St. Amant v. Thompson, 390 U.S. 727 (1968). En Bently v. Bunton, 45 Tex. Sup. Ct.J. 1172, 2001 WL 1946127 (Tex. 2002) el Tribunal Supremo de Texas expresó "[i]f the First Amendment precluded consideration of credibility, the defendant would almost always be a sure winner as long as

existencia de **malicia real**, el demandante puede hacer uso

de evidencia directa o indirecta.[48]

Del mismo modo, conviene señalar que la información

que es inherentemente improbable, que tan sólo una persona

temeraria puede decidir difundirla, no goza de la

---

he could bring himself to testify in his own favor. His
assertions as to his own state of mind, if they could not
be disbelieved on appeal, would surely prevent proof of
actual malice by clear and convincing evidence absent a
´smoking gun´ – something like a defendant´s confession on
the verge of making a statement that he did not believe it
to be true". Así también se expresó el Noveno Circuito de
Apelaciones al expresar en Eastwood v. National Enquirer,
Inc., 123 F. 3d 1249, 25 Media L. Rep. (BNA) 2198 (9th Cir.
1997), "As we have yet to see a defendant who admits to
entertaining serious subjective doubt about the
authenticity of an article it published, we must be guided
by circumstantial evidence. By examining the editors´
actions we try to understand their motives". Véase además,
R.A. Smolla, Law of Defamation, 2da edición, Thomson Legal
Publishing, Inc., 1997-2005, Vol.1, págs. 3.1- 3.148.

[48] Veáse Regla 10 (H) de evidencia, 32 L.P.R.A., Ap. IV,
R.10(H), que establece que "[c]ualquier hecho en
controversia es susceptible de ser demostrado mediante
evidencia directa o mediante evidencia indirecta o
circunstancial". Ya hemos expresado que la evidencia
circunstancial es intrínsecamente igual que la evidencia
directa. Véase, entre otros, Torres Maldonado v. J.C.
Penney Co., 130 D.P.R. 546 (1992) y Zambrana v. Hosp. Santo
Asilo de Damas, 109 D.P.R. 571, 525 (1980). Sobre la
evidencia circunstancial, E. Chiesa ha expresado que "[u]n
caso se puede probar por preponderancia de la prueba a base
de evidencia circunstancial. Así ocurre en la zona de
**elementos subjetivos de la causa de acción,** como el
discrimen en el empleo y el dolo que invalida el
consentimiento. En la zona de daños ´la evidencia
circunstancial se emplea comúnmente para establecer la
relación causal en casos de responsabilidad por productos
de consumo, porque en la mayoría de los casos se carece de
prueba directa´". [Énfasis suplido y escolios omitidos]. E.
Chiesa, Tratado de Derecho Probatorio, Publicaciones
J.T.S., (1998), Tomo I, págs. 1237-1238.

protección constitucional.  Pueden existir también razones

obvias para dudar de la veracidad de la fuente.[49]

Como señalamos en Pérez v. El Vocero de P.R., *supra*,

la prensa, además de ofrecer un servicio indispensable,

ostenta un poder inconmensurable.  Este poder lleva

aparejado una gran responsabilidad y debe ejercerse en

forma consciente.  Al igual que el derecho a la libertad de

prensa, existen unos derechos, también de rango

constitucional, a la intimidad y a la protección de la

dignidad del ser humano.  La libertad de prensa y de

expresión no puede ser un escudo que permita la destrucción

injusta de la dignidad de una persona.  El ocupar un cargo

público o ser una figura pública no implica que la persona

renuncia a la dignidad que tiene como miembro de la raza

humana.  Creemos firmemente que todo funcionario o figura

pública debe estar sujeto a un escrutinio estricto y a la

libre y abierta crítica.  No obstante, cuando éste es

difamado maliciosamente, debe tener disponible un remedio.

Es nuestro deber proteger la libertad de prensa, no la

licencia desenfrenada.[50]  El ejercicio de los derechos de

libertad de prensa y de expresión debe hacerse en forma

responsable respetando siempre los derechos a la intimidad

---

[49] García Cruz v. El Mundo, *supra*. Véase además, St. Amant v. Thompson, *supra*, pág. 732.

[50] Ex Parte Bird, 5 D.P.R. 247 (1904).

y a la dignidad de las personas.  La convivencia civil y democrática presupone que no se abusará de esos derechos.[51]

En el presente caso, el periódico intentó descargar su obligación inicial, sosteniendo que el señor Cabrero Muñiz no contaba con evidencia suficiente para sostener las alegaciones en su contra.  Sostuvo su pedimento en que el aquí recurrido carecía de la prueba suficiente para demostrar **malicia real** de su parte.[52]  Luego de un cuidadoso estudio de la solicitud de sentencia sumaria presentada por el referido periódico, y de los documentos que la acompañan, entendemos que el periódico cumplió con lo requerido inicialmente en este tipo de casos.  Por ello, se transfirió  la carga de la prueba al promovido, a quien, como antes expresamos, se le exige un mayor rigor en esta etapa de los procedimientos.

Un examen ponderado de los documentos en nuestro expediente, nos convence de que el señor Cabrero Muñiz cumplió con su obligación de demostrar, en la etapa de la ponderación de la solicitud de sentencia sumaria, que tiene evidencia suficiente que, **de ser admitida y creída en su día**, podría demostrar los elementos constitutivos de **malicia real** de parte del aquí peticionario.  Veamos.

Al presentar su oposición a la solicitud de sentencia sumaria presentada por El Día, Inc., el señor Cabrero Muñiz

---

[51] <u>Aponte Martínez v. Lugo</u>, 100 D.P.R. 282, 290 (1971).

[52] Véase, Moción Solicitando Sentencia Sumaria Parcial, *supra*.

acompañó copia de un extenso y detallado escrito preparado por él, que contiene hechos de su propio y personal conocimiento, adquiridos mientras se desempeñaba como Síndico Liquidador de la C.R.U.V. y del cual, según alegó, surge controversia real sobre las actuaciones maliciosas del codemandado El Día, Inc.[53]   El señor Cabrero Muñiz logró demostrar la existencia de controversias sobre hechos esenciales y materiales.   En específico, el señor Cabrero Muñiz presentó prueba mediante la cual intenta demostrar que las diferentes publicaciones eran el resultado de una decisión de El Nuevo Día, de no adquirir conocimiento de hechos que podían  confirmar la falsedad de lo publicado.   De ser creída esa prueba por el Tribunal de Primera Instancia, el demandante podría demostrar la presencia de **malicia real** de parte del periódico.   Reiteramos que, aunque el dejar de investigar, por si solo, no sostiene una determinación de **malicia real**, el evitar deliberada y **decididamente** la búsqueda de la verdad podría sostener tal determinación.

De la prueba presentada por el señor Cabrero Muñiz, surge que existen hechos esenciales y materiales en controversia que, de ser creídos en su día, podrían demostrar la presencia de **malicia real** de parte de la

---

[53] "Actuaciones indebidas de El Nuevo Día sobre venta a Freddy Valentín y otros asuntos", Exhibit 1 de la Oposición a la moción de sentencia sumaria presentada por el codemandado El Nuevo Día, Inc., Apéndice del recurso de *Certiorari*, págs. 268-333, a la pág. 277.

reportera. Específicamente, respecto a la falla de ésta en conseguir las fuentes disponibles más obvias de corroboración o refutación. Entre otras, resaltamos las siguientes:

1)    Respecto al reportaje titulado "Se complica la transacción", la reportera Magdalys Rodríguez indicó lo siguiente: "El Síndico dijo que vendió los apartamentos al precio de tasación, que es el requisito de ley. Pero no contestó quién fue el tasador. Sólo dijo: ´un tasador cualificado´. Este diario solicitó copia de las subastas, pero Cabrero sólo respondió que quien conozca del proceso de ejecución de propiedades sabe que luego se vende en subasta a la misma vez".[54] Por su parte, el señor Cabrero Muñiz indicó que en "ningún momento la periodista ha pedido la tasación".[55]

2)    El señor Cabrero Muñiz se refiere a una llamada de la periodista del 22 de octubre de 1997, en la que ésta le solicitó una reunión. Alega el señor Cabrero Muñiz "[s]e le indicó que podíamos reunirnos la semana próxima y le indiqué el interés de que corrigiera el asunto de la venta a Freddy Valentín. A esto indicó que no pensaba publicar nada más sobre este asunto. Le exigí que publicara, ya que tenía la obligación de corregir teniendo la documentación que establece la

---

[54] Íd., pág. 301 y Apéndice del recurso de *Certiorari*, pág. 136.

[55] Íd., pág. 301.

verdad del asunto, que había publicado un sinnúmero de mentiras y había tergiversado la verdad en diversas ocasiones.

Se le dió [sic] el teléfono del Sr. Eduardo Ryan, tasador, para cualquier duda sobre la tasación. Se le dió [sic] el teléfono de HERA Development Corp. para que corroborara las razones para haber desistido de la compra."[56]

3) Arguye el señor Cabrero Muñiz en el referido escrito, que el 22 de octubre de 1997 se le entregó a la periodista copia del Reglamento de la Oficina con una carta "que a una persona con buena intención y algún sentido de responsabilidad no se le haría posible cuestionar nuestro cumplimiento con el mismo y con la ley. En la carta, entre otras cosas, se le refiere a artículos específicos del reglamento que aseguran se ha obtenido el precio justo y adecuado...".[57]

4) El señor Cabrero Muñiz le envió una carta a la periodista indicándole "Acordamos además reunirnos el próximo martes para dialogar sobre cualquier otro asunto relacionado a las operaciones y estados financieros de esta oficina". Por otra parte, la misiva señalaba: "Le solicito que ahora que usted tiene la versión correcta y documentada sobre el caso de referencia, escriba artículo [sic] exponiendo nuestra

---

[56] Íd., pág. 308.

[57] Íd.

posición y aclarando las falsedades vertidas por el Representante Zayas Seijo".[58] Entendió el señor Cabrero Muñiz que "...si se cuestiona la buena fe de la oficina diciendo que no se le ha entregado una tasación que nunca ha pedido ¿no debería publicar lo que refleja la tasación cuando se le entrega?"[59]

5)    Según alega el señor Cabrero Muñiz, el 23 de octubre de 1997, la reportera "[h]a manifestado, a pesar de nuestrs [sic] continuas solicitudes, que no piensa escribir nada más sobre el caso Valentín."[60]

6)    El 23 de octubre de 1997, el periódico San Juan Star en español e inglés, publicó la posición de la oficina del Síndico Liquidador bajo el título "Síndico de la C.R.U.V. contradice al legislador".[61]

7)    El señor Cabrero Muñiz arguye que, aunque la reportera tenía "...amplio conocimiento de que la ley y el Reglamento no requieren publicación de anuncios, ya que las ventas se hacen por tasación a tenor con el Reglamento..." y de que ésta "[t]iene conocimiento específico de las secciones del Reglamento que contempla la facultad de vender por tasación"[62] y de que "[t]iene conocimiento que desde el origen de la

---

[58] Íd., págs. 309-310.

[59] Íd., pág. 310.

[60] Íd.

[61] Íd., págs. 310-311.

[62] Íd., pág. 311.

oficina, o sea desde el 1991, bajo la pasada administración, también se vendía por tasación"[63]; y "[t]iene conocimiento de que los procedimientos de venta mencionados fueron auditados por la Oficina de la Contralor y se ha determinado que la venta por tasación está en ley."[64]    Por todo ello, sostiene el señor Cabrero Muñiz que "...el propósito de la noticia es ocasionar daño imputando un falso incumplimiento con la ley.  Son imputaciones de la periodista, quien obvia para hacerlas a las personas con conocimiento de nuestras operaciones y de nuestros deberes de ley. Ataca únicamente al suscribiente y no a los síndicos anteriores que operaron bajo el mismo procedimiento."[Énfasis en original][65]

8)    El periódico El Vocero, publicó la noticia de The Associated Press titulada "Justifica Ventas Síndico CRUV". [66]

9)    El 6 de noviembre de 1997, el señor Cabrero Muñiz le envió una carta a la reportera con un comunicado de prensa con fecha del 4 de noviembre de 1997 preparado por éste, en relación a la visita del entonces legislador Zayas Seijo a la Sindicatura para revisar el expediente de venta a Freddy Valentín.  En la referida

---

[63] Íd., págs. 311-312.

[64] Íd., pág. 312.

[65] Íd.

[66] Íd., pág. 316.

misiva, el señor Cabrero Muñiz dice lo siguiente: "Exijo disculpas públicas por parte del Representante Francisco Zayas Seijo y el periódico EL NUEVO DÍA por la difamación, libelo y persecución política a la que este servidor público ha estado sometido. Igualmente exijo disculpas para mi familia."[67]

10) El 20 de noviembre de 1997, el señor Cabrero Muñiz envió una carta al señor Antonio Luis Ferré solicitando que se eliminara a la periodista de atender asuntos de su oficina.[68]

Tomando en consideración la prueba presentada por las partes, el foro primario entendió que no procedía dictar sentencia sumaria a favor del rotativo. A esa misma conclusión llegó el foro intermedio apelativo.

El foro intermedio apelativo erró al no considerar el estándar aplicable a casos de libelo cuando se presenta una solicitud de sentencia sumaria. No obstante, ello no es razón para intervenir con su determinación. A la luz del estándar aplicable y conforme a la prueba ante nos, entendemos que tanto el foro primario como el Tribunal de Apelaciones actuaron correctamente al denegar la solicitud de sentencia sumaria presentada por el periódico.

No estamos, de ninguna forma, haciendo una determinación sobre si el periódico actuó o no con **malicia real**. Ello dependerá, enteramente, de la credibilidad que

---

[67] Íd., pág. 327.

[68] Íd., pág. 331.

le merezca al Tribunal de Primera Instancia y de su evaluación de toda la prueba a ser presentada por las partes.

III

En el presente caso, El Día, Inc. también sostiene que los reportajes en cuestión estaban protegidos por la defensa del reportaje justo y verdadero. Veamos.

Nuestro estatuto de libelo y calumnia estableció diversos tipos de comunicaciones privilegiadas, algunas de las cuales eran absolutas y otras solamente condicionales o restringidas.[69] Así, la sec. 3144 de la Ley de Libelo y Calumnia[70] dispone lo siguiente:

> **§ 3144. Comunicación no tenida por maliciosa, publicación que se presume no maliciosa**
>
> No se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. No se presumirá que es maliciosa la publicación que se hace:
>
> *Primero.*--En el propio desempeño de un cargo oficial.
>
> *Segundo.*--**En un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos.**
>
> *Tercero.*--A un funcionario oficial, apoyada en causa probable, con la

---

[69] Villanueva v. Hernández Class, *supra*, pág. 647.

[70] 32 L.P.R.A. sec. 3144.

> intención de servir al procomún, o de
> conseguir remedio a un perjuicio
> hecho a un particular. (énfasis
> suplido).

Son dos los requisitos que deben estar presentes para que se pueda configurar el **"privilegio del reporte justo y verdadero"**. En primer lugar, el reportaje tiene que ser justo en relación con el proceso que es objeto de información.[71] El reporte es **justo** si éste captura la substancia de lo acontecido y si toma en consideración el probable efecto que tendrá en la mente de un lector y oyente promedio.[72] El segundo elemento del privilegio consiste en que lo publicado tiene que ser cierto; ello desde el punto de vista de que – aun cuando la información que se brinda en el procedimiento judicial, legislativo u oficial sea falsa o libelosa – el reportaje o noticia publicada es "cierta" por cuanto refleja la verdad de lo expresado o acontecido en el procedimiento llevado a cabo.[73] Para que se cumpla con el elemento de la veracidad de lo relatado no es necesario que lo publicado sea exactamente "correcto", sino que bastará con que se publique un extracto sustancialmente correcto de lo ocurrido.[74] Hemos

---

[71] Villanueva v. Hernández Class, *supra*, págs. 647-648. Véase además, MiGi, Inc. v. Gannett Massachusetts Broadcasters, Inc., 519 N.E.2d 283 (1988).

[72] Villanueva v. Hernández Class, *supra*, citando a Murray v. Bailey, 613 F.Supp.1276 (1985).

[73] Íd.

[74] Íd., citando a R. A. Smolla, *op cit.*, 1986.

expresado que el referido privilegio, protege inclusive a quien publica información falsa o difamatoria, siempre que la misma recoja y refleje **verazmente** lo acontecido en los procedimientos, informes o acciones públicas u oficiales de agencias gubernamentales.[75]

El fundamento que sostiene el referido privilegio responde al hecho de que es preferible que las causas se ventilen ante los ojos públicos, no porque las controversias que existan entre un ciudadano y otro sean de interés público, sino porque es de suma importancia que aquellos que administran la justicia estén siempre conscientes de su responsabilidad para con el público, y que todo ciudadano **se convenza por sus propios ojos** de la forma en que se da cumplimiento a un deber público.[76]   Lo que se persigue es que el reportero actúe **como sustituto del público** en la observación del evento (énfasis suplido).[77]

Con ello en mente, hemos resuelto que el referido privilegio se pierde en el caso de que se publique una parte parcializada y subjetiva de la historia.[78]   Lo mismo ocurre si el demandante logra probar que el demandado publicó la información actuando **maliciosamente**, con ánimo

---

[75] Íd.

[76] Veáse, Villanueva v. Hernández Class, *supra*, citando a Caraballo v. P.R. Ilustrado, Inc., 70 D.P.R. 283 (1949).

[77] Villanueva v. Hernández Class, *supra*, pág. 648.

[78] Íd.

prevenido, con el propósito de causar daño o conociendo la falsedad de la información.[79]

Nos reiteramos en que el señor Cabrero Muñiz demostró contar con evidencia que, de ser creída en su día por el juzgador, podría establecer la existencia de **malicia real**. De existir **malicia real** por parte del rotativo, éste perdería el privilegio en cuestión, toda vez que el mismo no protege al periódico que publica una parte parcializada y subjetiva de la historia.[80] En el presente caso, tal

asunto es un hecho material y esencial que ha sido controvertido adecuadamente por el señor Cabrero Muñiz.

Por todo lo antes expuesto disentimos de lo actuado por la mayoría de revocar la Resolución recurrida, emitida por el Tribunal de Apelaciones. Somos de la opinión que en este caso era necesario la celebración de una vista en su fondo y la presentación de prueba ante el Tribunal de Primera Instancia.


                                    Efraín E. Rivera Pérez
                                    Juez Asociado


_____

[79] Íd., citando a Lulay v. Peoria Journal Star, 214 N.E.2d 746 (1976); Schiavone Const. Co. v. Time, Inc., 735 F.2d 94 (3er Cir. 1984); D´Alfonso v. A.S. Abell Co., 10 Med. L.Rep. 1663 (D. Md.1984), confirmado en 765 F.2d 138 (4to Cir. 1985); Pearce v. Courier-Journal, 683 S.W.2d 633 (Ky.App. 1985).

[80] Villanueva v. Hernández Class, *supra*.